UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | No. 1:22-cv-01259-JRS-TAB |
| OPE USIC HOLDINGS, INC., USIC LOCATING SERVICES, LLC F/K/A USIC LOCATING SERVICES, INC., | ) ) ) ) ) | |
| Defendants. | ) | |

**Order on Cross-Motions for Summary Judgment**

This is a fight about insurance coverage for legal fees. USIC is a utilities locating service that was sued over a gas explosion in Kansas City. Liberty Mutual insured USIC, and part of its insurance agreement was that Liberty would pay a portion, but not all, of USIC's legal fees for defending against the gas explosion suits. That portion was to be determined by a formula set out in the policy. Liberty thinks the formula uses a high measure of damages as the denominator so that its portion of defense costs is low; USIC thinks the reverse. There are two disputes here: (i) whose interpretation of the formula is correct? and (ii) did Liberty mislead USIC about the correct interpretation?

Now before the Court are the Parties' Cross Motions for Summary Judgment on those questions. (ECF No. 56 (Liberty), ECF No. 76 (USIC).)

**I.    Legal Standard**

The legal standard on summary judgment is well established:

> Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Skiba* [*v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018)] (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 [] (1986)). A theory "too divorced from the factual record" does not create a genuine issue of material fact. *Id.* at 721. "Although we construe all facts and make all reasonable inferences in the nonmoving party's favor, the moving party may succeed by showing an absence of evidence to support the non-moving party's claims." *Tyburski v. City of Chicago*, 964 F.3d 590, 597 (7th Cir. 2020).

*Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 718 (7th Cir. 2021). The Court applies that standard here.

**II.  Discussion**

    A. The Formula

        i. Background

The formula in dispute comes from an "Allocated Loss Adjustment Expense" endorsement in the Liberty-USIC insurance contract. ("Allocated Loss Adjustment Expense" is, here at least, simply insurance jargon for legal fees.) The relevant portion reads:

> Where the insured controls the defense, we will reimburse the insured for our proper share of the "allocated loss adjustment expense" paid by the insured for each "occurrence" under Coverage A or injury sustained by one person or organization under Coverage B. Our proper share shall be calculated as follows:
>
> > We shall first determine the percentage of the damages attributable to this policy and the "self-insured amount" by dividing the damages payable under this policy plus the "self-insured amount" by the total amount of damages.
> >
> > Next, we will determine the "allocated loss adjustment expense" attributable to this policy and the "self-insured amount" by

2

> multiplying the percentage determined above by the total of "allocated loss adjustment expense".
>
> Finally, our proper share of the "allocated loss adjustment expense" attributable to this policy and the "self-insured amount" will be the ratio of damages payable under this policy to the total amount of damages paid under this policy plus the "self-insured amount".

> If a claim or "suit" does not result in damages that we are obligated to pay under the policy, our proper share of the "allocated loss adjustment expense" shall be 0%.
>
> For each claim or "suit", you are responsible for all "allocated loss adjustment expense" until the claim or "suit" is resolved and our proper share can be determined.
>
> The First Named Insured shown in the Declarations shall maintain adequate records and supporting data for any reimbursement of "allocated loss adjustment expense" due from us.

(Contract 79, ECF No. 1-1.) The Parties of course have their dueling interpretations of those words. But before diving into the legalese, it is helpful to take a step back and consider what this provision is trying to do. It is trying to allocate legal fees between Liberty and USIC. It answers the basic question: after USIC defends a lawsuit, what portion of its legal fees will Liberty pay?

Without knowing anything about the formula, the reader can already guess that the answer is going to be some percentage between zero and one hundred. And because it is a contract made and agreed to by reasonable people, that percentage is probably going to bear some relation to the Parties' underlying responsibilities in the lawsuit the fees are spent on. So Liberty is probably going to pay more of USIC's legal fees in cases where Liberty pays more of USIC's damages. A reader might even

3

hazard the guess that Liberty will pay the *exact same percentage* of USIC's legal fees as it pays percentage of USIC's damages.

Those are common-sense constraints. The Court, even before parsing the formula, should be ready to reject any reading that makes Liberty responsible for more than 100% of the legal fees actually incurred. The Court should also be ready to reject at this stage any reading that relies on extraneous factors to determine the fee split between Liberty and USIC.

## ii. Walkthrough

Now to the formula itself. In the first quoted paragraph Liberty commits to pay its "proper share of the 'allocated loss adjustment expense.'" The formula is set out in the next three indented paragraphs that define Liberty's "proper share."

First, dividing "the damages payable under this policy plus the 'self-insured' amount" by the "total amount of damages" yields the "percentage of the damages attributable to this policy and the 'self-insured amount.'" To make sense of that, one needs to know that there are, under this policy, three ranges of damages: damages up to $1 million are self-insured by USIC; damages from $1 million to $4 million are covered by Liberty's $3 million policy; and damages over $4 million are excess (to be borne either by USIC or, as it happens, by USIC's excess insurer). The first step distinguishes between those ranges: the "self-insured amount" is the initial $1 million in damages before Liberty's coverage is reached; the "damages payable under this policy" are any damages (up to $3 million in amount) that fall in the $1 million to $4 million range of Liberty's coverage; the "total amount of damages" is whatever

4

damages, from zero to infinity, USIC incurred in the suit. The first step groups the "self-insured amount" and the "damages payable under this policy" to divide them by "total damages"—in other words, it is asking how much of the total damages is within the first two damages ranges, *i.e.*, covered either by Liberty's policy or by USIC's initial $1 million self-insurance. For any amount of "total damages" less than $4 million, the first step yields 1—that is, 100%—because all damages up to $4 million are either "self-insured" or "payable under this policy." For total damages over $4 million, some portion of the damages are neither "self-insured" nor "payable under this policy," and so the percentage of damages attributable to those categories is less than 100%.

Next, at step two, "multiplying the percentage determined above" by "the total of 'allocated loss adjustment expense'" yields "the 'allocated loss adjustment expense' attributable to this policy and the 'self-insured amount.'" This step apportions legal fees in the simplest possible manner: the portion of the fees "attributable to this policy and the 'self-insured amount'" is exactly equal to the portion of damages "attributable to this policy and the 'self-insured amount.'" So if total damages are less than $4 million, such that 100% of the damages are either self-insured or payable under the policy, then 100% of legal fees are likewise attributable to either the self-insured amount or the policy.

Thus far the first two damages ranges are treated together, as "this policy and the 'self-insured amount.'" That works to isolate the damages up to the top of Liberty's coverage, at $4 million, from excess damages. But there still needs to be a division of

5

responsibility between USIC, which bears the "self-insured amount," and Liberty, which bears "this policy." That is what step three does. Here the formula stops treating the first two damages ranges together. The "damages payable under this policy" divided by "the total amount of damages paid under this policy plus the 'self-insured amount'" yields Liberty's "proper share" of the "'allocated loss adjustment expense' attributable to this policy and the 'self-insured amount'" calculated in step two. This is like step two in that it is the simplest possible manner of apportioning responsibility: each party is responsible for fees in exact proportion to its responsibility for damages.

The following diagram might be worth a thousand words:

$$\boxed{\text{Step 1}} \qquad \boxed{\text{Step 2}} \qquad \boxed{\text{Step 3}}$$

$$\frac{\cancel{DPP + SIA}}{DT} \quad \times \quad FT \quad \times \quad \frac{DPP}{\cancel{DPP + SIA}}$$

The "damages payable under this policy plus the 'self insured amount'" term appears (abbreviated DPP + SIA) in both the numerator of step one and the denominator of step three—thus cancelling out. That leaves only "damages payable under this policy" (DPP) divided by total damages (DT)—in other words, Liberty's share of damages—times total fees (FT). As it turns out, then, the formula works exactly like the naïve reader might expect: each party pays the same portion of fees as it pays portion of damages. (The Court wonders why the contract does not just say as much.)

And the share of fees Liberty will pay is, just as expected, between zero and one hundred percent.[1]

              iii.  Calculation

The Court is now prepared to plug numbers into the formula and tell the Parties their respective obligations.  All the Court needs to know is (i) how much USIC paid to resolve the gas explosion suits and (ii) how much USIC paid in legal fees.

Neither Party gives a good answer to the first item, and the record is deplorably unclear.  But USIC asserts its excess insurer paid $539,000 toward settling the gas explosion suits, (Defs.' Resp. 18, Material Facts ¶17, ECF No. 76), which did not exhaust that policy, (Excess Policy 4, ECF No. 73-12).  The excess insurance only kicked in after USIC ran through $1 million in self-insurance and the $3 million Liberty policy, so USIC's total cost to resolve the gas explosion suits must have been $4,539,000.

The record on legal fees is little better.  USIC asserts it spent $11,650,130.65 on defense, which number Liberty does not basically deny, except to point out that some $6.5 million of those defense costs were paid by USIC's excess insurer, not USIC itself.

---

[1] As it happens, under this particular arrangement of coverage, Liberty's maximum possible contribution is 75% of legal fees: that occurs when exactly $4 million in damages exhausts the full $3 million "damages payable under this policy" and the $1 million "self-insured amount."  If damages are lower than $4 million, the self-insured amount bulks larger (*e.g.*, at $2 million in damages, Liberty and USIC each pay $1 million for a 50-50 split, so Liberty's portion of the legal fees would be 50%); if damages are higher, the excess damages dilute the effect Liberty's coverage (*e.g.*, at $6 million in damages, Liberty pays its maximum $3 million in "damages payable under this policy" but those are only 50% of the total, and Liberty's portion of the legal fees would amount to 50% of the total legal fees as well).  Plotting the curve of Liberty's fees against total damages, one would see it flat at 0% at $0-$1million, then rising to a peak of 75% at $4million, then falling again from $4million to approach 0% again, asymptotically, as damages go to infinity.

(Defs.' Resp. 18, Material Facts ¶17, ECF No. 76; Pl.'s Reply 7, ECF No. 81.) There is an unexplained discrepancy of some $300,000, which the Court will ignore for the moment. (*Id.*)

Say, then, that USIC paid $4,539,000 in damages and spent $11,650,130.65 in legal fees to get there. Liberty's share of the damages is 66%—that is the $3 million it contributed divided by the total $4.539 million—so its fee contribution is 66% of the total $11.65 million—which is $7.7 million, as near as makes no difference.[2]

### iv. Disputes

Neither Party comes out anywhere close to $7.7 million. What happened?

Liberty claims the "total amount of damages" in step one is $92,387,000.85—that is the full amount paid by all parties, not just USIC, to resolve the gas explosion suits. (Pl.'s Br. Supp. 18, ECF No. 58.) Liberty thinks that because the "total amount of damages" is not specifically limited to USIC's damages, it must mean everybody's damages.

That is no good at all. First, not only does the introduction to the formula begin with "When the insured controls the defense," which would not be the case with damages attributable to other parties in perhaps even other suits, but it ruins the

---

[2] That is the easy way, using basic properties of multiplication to simplify the calculation. One can, of course, walk through the (unnecessarily roundabout) formula to get the same result. Step one: damages payable under this policy, $3 million, plus self-insured amount, $1 million, divided by total damages of $4.359 million, yields 88.13%. Step two: 88.13% times the total "allocated loss adjustment expense" of $11.65 million gives $10.267 million in "allocated loss adjustment expense" attributable to the policy and the self-insured amount. Step three: the ratio of damages payable under the policy, $3 million, to the combined policy damages plus self-insured amount, $4 million, is 75%, and 75% of $10.267 million is $7.7 million.

8

logic of the formula, the common sense of which the Court has already explained, by importing extraneous terms. It is absurd to make the Liberty-USIC fee split depend on other suits, which are likely to have other defendants, other insurers, and other degrees of relative responsibility. There could very well be suits of which neither Liberty nor USIC has any knowledge! Second, it is disingenuous to assert that "damages" is an unbounded term in the contract. The very first substantive provision of the policy is that Liberty "will pay those sums . . . that the insured becomes legally obligated to pay as damages." (Contract 16, ECF No. 1-1.) Not anybody's damages, only the insured's damages: USIC's. Whenever the contract talks about "damages" it is talking about USIC's legal obligations to pay. (*Cf. id.* at 28 ("The insured is responsible for all damages within the 'self-insured amount'.").)

Liberty also thinks the "allocated loss adjustment expense" is $4,876,503.76—the defense costs USIC itself paid, excluding amounts paid on its behalf by its excess insurer. (Pl.'s Br. Supp. 16–17, ECF No. 58.) Liberty points to the introductory paragraph in which it promises to pay its proper share of fees "paid by the insured"—and "by the insured," it says, means *directly* by the insured.

That is not a good reading, either, though it is a closer question than the former. The dictionary is no help, because "by" is a flexible word. It can mean "directly by" and it can mean "directly or indirectly by." So the Court looks to context.

First, there is (again) the logic of the formula: the basic agreement is that Liberty will pay same the portion of defense costs it pays portion of damages. That is *ex ante* fair, making the reasonable assumption that defense costs scale linearly with

9

damages. It should not matter how USIC funds its defense, nor should Liberty be able to benefit *ex post* from USIC's other indemnifiers, if any.

By the same token, it seems odd to let Liberty's obligation depend on USIC's arrangements with third parties. Here, USIC's excess insurer paid the law firm directly. But what if USIC had paid first and been reimbursed later, just like the fee arrangement it has here with Liberty? That change is independent of and arbitrary with regard to Liberty's promise, so it should not have any effect.

Other words in the contract also suggest indemnities should have no effect. The contract provides that Liberty will "reimburse" USIC "where [it] controls the defense." (Contract 79, ECF No. 1-1.) Until the "'suit' is resolved and [Liberty's] share can be determined," "[USIC is] responsible for" legal fees. (*Id.*) USIC "controls" and is "responsible"—it has free rein to arrange its defense, to include the possibility of excess insurers. Liberty's obligation is simply to pay a *pro rata* share of the costs based on the eventual damages.

Liberty protests that here USIC will receive a windfall on legal fees. That is true in dollar terms: USIC's excess insurer paid $6.5 million in legal fees, leaving USIC with some $4 million still to pay—yet USIC here stands to get $7.7 million from Liberty. But the windfall comes from the formula. Liberty agreed to pay an equal share of legal fees and damages; in so doing it assumed that legal fees and damages correlate linearly—that is, each marginal dollar of defense spending has the same effect on damages. That is a reasonable assumption at the outset, but here the correlation did not hold: USIC apparently spent $4 million in fees to chalk up its first

10

$4 million in damages, but then it spent $6.5 million in fees for only $0.5 million more in damages. USIC's defense got way more effective, in fees-per-damages terms, after Liberty's policy was exhausted.[3] That means, in this case, Liberty pays more in fees than it wants. But it could just as easily have happened the other way—suppose USIC exhausted the Liberty policy then, disastrously, spent $1 million in legal fees to lose $96 million in damages. Liberty would pay 3% of $ 5 million in fees, far less than it would expect. Any time the fees-damages correlation does not hold, there will be a perceived "windfall" to one party or the other after the fact. It is no reason to upset the natural reading of the Parties' bargain. At base, then, this is a simple allocation of risk between the Parties that may at times skew from one side to the other, but which contains no provision limiting or otherwise taking into account any excess or supplemental third-party coverage.

USIC's disputes are easier to resolve. USIC appears to share the Court's understanding of the contract. (Defs.' Cross-Motion 30–31, ECF No. 76 (asserting that "general framework" of the formula is undisputed).) But when it comes time to plug numbers into the formula, USIC slips in "policy limit" instead of "damages payable under this policy" (in step one) and "damages paid under this policy" (in step three). (*Id.* at 29.) And USIC uses $3,289,000 as its damages: which is the $4,539,000

---

[3] It is not quite right to call large fees for small damages "effective" *tout court*, because the ideal outcome in defense litigation—for the defendant, if not its lawyers— is small fees for small damages, or better yet small fees for no damages at all. But USIC's and Liberty's incentives are imperfectly aligned. USIC gets *none* of its legal fees paid when it wins, (Contract 79, ECF No. 1-1 ("If a claim . . . does not result in damages . . . our proper share . . . . shall be 0%")), so if it faces exposure above its self-insured amount its optimal strategy is to lose just the right amount, $4 million, to maximize Liberty's fee contribution.

the Court uses, less $1.25 million Liberty paid under the policy to a co-defendant in the gas explosion suits.

Neither substitution is warranted. First, the contract says "damages payable" and "damages paid," not "policy limit." "Damages paid" are equal to the policy limit for damages over $4 million, but not for damages under $4 million. Glossing over the difference yields absurd results in USIC's calculation, where it has step one yielding an answer greater than 100%.

Second, USIC's damages must include the $1.25 million Liberty paid elsewhere, because that money came out of the USIC-Liberty policy and was spent resolving the consequence of the gas explosion. Dollars are fungible. If Liberty had not spent that money settling with other gas explosion defendants, USIC would have had it available to settle claims directly from gas explosion plaintiffs.

### B. Bad Faith

The Parties agree on the Indiana law of bad faith. Indiana prohibits insurers from "(1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim." (Pl.'s Br. Supp. 20–21, ECF No. 58 (quoting *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 519 (Ind. 1993)); Defs.' Cross-Motion 51, ECF No. 76 (quoting *Monroe Guaranty Insurance Co. v. Magwerks Corp.*, 829 N.E.2d 968, 976 (Ind. 2005)).) An insurer's conduct is not bad faith unless it has a culpable state of mind. *Magwerks*, 829 N.E.2d at 977.

Liberty asks the Court to find "as a matter of law" that USIC cannot prove its claim. (Pl.'s Br. Supp. 23, ECF No. 58 (no citation to legal authority).) How? This is summary judgment, and the Court is not a jury: it is not to "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022) (quoting *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021)).

As USIC tells it, it made a simple bargain with Liberty: for Liberty to pay the same portion of fees Liberty pays in damages. Liberty put that simple bargain into legalese, then, when it came time to pay up, pointed to supposed ambiguities, introduced by its own execrable writing, as a reason not to pay. And that, USIC continues, was Liberty's plan all along—so here we are two years deep into a coverage suit (itself nine years after the gas explosion) over terms that a reasonable jury might find could have fit on a postcard.

Liberty might not like that picture, but it cannot wave it away as "not even close to bad faith." (Pl.'s Br. Supp. 23, ECF No. 58.) The conduct USIC alleges appears to be quintessential bad faith. (If it isn't, what is?) USIC has some evidence in support of its story, (*see generally* Defs.' Statement of Facts, ¶¶ 25 ff., ECF No. 76 (citing, *e.g.*, ECF No. 74-9 (Liberty's internal notes on coverage strategy), ECF No. 74-8 (Liberty's internal notes setting legal fee reserve)), which a jury could reasonably believe. Still, the Court cannot resolve the disputed material facts on summary judgment.

13

The punitive damages analysis works the same way.  Liberty again invites the Court to hold that USIC cannot show "oppressiveness" or the like to the requisite "clear and convincing" standard.  (Pl.'s Reply 23, ECF No. 81.)  But USIC does have evidence; a jury that believed USIC could be clearly convinced of oppressiveness; and so the Parties will have to persuade the jury, and not the Court.

### III. Conclusion

The formula conceals a common-sense agreement beneath layers of jargon.  The Parties, focusing on the jargon and not the basic terms, go astray in their interpretations.  The Court hopes to have clarified the Parties' contractual obligations.  But the Court lacks the factual record accurately to perform its own calculation, and there are, in any case, disputes of material fact for trial on the bad faith and punitive damages claims.  The Parties Cross Motions for Summary Judgment, (ECF No. 56 (Liberty), ECF No. 76 (USIC)), are **denied.**

The Parties are invited to contact the Magistrate Judge and explore the possibility of resolving this case before trial.

**SO ORDERED.**

Date: 04/22/2024

_JAMES R. SWEENEY II, JUDGE_
United States District Court
Southern District of Indiana

14

Distribution:

Magistrate Judge Tim A. Baker

Charles W. Browning
PLUNKETT & COONEY, P.C.
cbrowning@plunkettcooney.com

David B. Helms
GM Law PC
davidh@gmlawpc.com

Benjamin D. Mooneyham
GM Law PC
benm@gmlawpc.com

Tanya Murray
Plunkett Cooney
tmurray@plunkettcooney.com

Kenneth C. Newa
PLUNKETT COONEY, PC
knewa@plunkettcooney.com

Pamela A. Paige
Plunkett Cooney, P.C.
ppaige@plunkettcooney.com